WONG FLEMING, P.C.
Daniel C. Fleming, NJ Bar No. 18631986
821 Alexander Road, Suite 200
P.O. Box 3663
Princeton, NJ 08543-3663
Tel.: (609) 951-9520
Fax: (609) 951-0270
Email: dfleming@wongfleming.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**(TRENTON)**

| | |
|---|---|
| GPH FORT ATKINSON LLC; | )<br>) |
| GPH GREENFIELD LLC; | )<br>) |
| GPH MUSCODA LLC; and | )<br>) |
| SILVER SPRING ACQUISITION LLC; | ) **CASE NO.:** 3:25-cv-6141<br>) |
| PLAINTIFFS, | )<br>) |
| v. | )<br>) |
| MARTIN CHOPP; | )<br>) |
| LYNN CHOPP; | )<br>) |
| SOLOMON CHOPP; | )<br>) |
| RACHEL CHOPP; | )<br>) |
| SARAH CHOPP a/k/a SARA RUBIN; | )<br>) |
| PNINA CHOPP; | )<br>) |
| AVROHOM PRAGER; | )<br>) |
| SHULAMIT PRAGER; and | )<br>) |
| BEDROCK HC WI LLC, | )<br>) |
| DEFENDANTS. | ) |

# COMPLAINT

Plaintiffs GPH Fort Atkinson LLC ("GPH Fort Atkinson"); GPH Greenfield LLC ("GPH Greenfield"); GPH Muscoda LLC ("GPH Muscoda"); and Silver Spring Acquisition LLC ("Silver Spring") (together GPH Fort Atkinson, GPH Greenfield, GPH Muscoda, and Silver Spring are "GPH Entities"), for their Complaint against Defendants Martin Chopp, Lynn Chopp, Solomon Chopp, Rachel Chopp, Sarah Chopp a/k/a Sara Rubin, Pnina Chopp, Avrohom Prager, Shulamit Prager (collectively the "Individual Defendants"), and Bedrock HC WI LLC.

## NATURE OF ACTION

1. This is an action by GPH Entities, the owners of real property (the "Premises") of four skilled nursing facilities in Wisconsin (the "Facilities"), to recover amounts due to them pursuant to their lease of the Premises to non-party tenants Bedrock HCS at Atkinson LLC; Bedrock HCS at Glendale LLC; Bedrock HCS at Greendale LLC; and Bedrock HCS at Riverdale LLC (collectively, "Tenants") for Tenants to operate. While Tenants were obligated to pay rent to the GPH Entities, maintain the Premises as required by the lease, pay the property taxes for the Premises, pay all other operating expenses of the Facilities, and operate the Facilities as high quality skilled nursing facilities, Defendants, each of which had a direct or indirect ownership interest in Tenants, pillaged Tenants' funds, leaving Tenants unable to meet their obligations under the lease, resulting in significant damage to GPH Entities, the Premises, and the Facilities.

2. As set forth in more detail below, while Defendants were removing the funds of Tenants without any consideration being provided to Tenants, Tenants had unreasonably small capital to operate their business of providing care to residents of the nursing homes, were unable

to meet their current obligations as they came due, and had assets of substantially less value than their liabilities. Defendants nevertheless removed the funds from Tenants through distributions and withdrawals. Further, GPH Entities had a security interest in the funds removed by Defendants and the removal of the funds was done in direct violation of the subordination terms of the lease.

3. Accordingly, GPH Entities bring this action to void the transactions by which Defendants removed the funds and to seek damages against Defendants for their conversion of the funds, tortious interference with GPH Entities' lease relationship with Tenants, and civil conspiracy to accomplish the foregoing.

## THE PARTIES

4. GPH Fort Atkinson is a Delaware limited liability company. It is ultimately owned through a succession of single member limited liability holding companies by Drumm Merger Co., which is a Delaware corporation with a principal place of business in California. Accordingly, it is a citizen of Delaware and California for purposes of diversity.

5. GPH Greenfield is a Delaware limited liability company. It is ultimately owned through a succession of single member limited liability holding companies by Drumm Merger Co., which is a Delaware corporation with a principal place of business in California. Accordingly, it is a citizen of Delaware and California for purposes of diversity.

6. GPH Muscoda is a Delaware limited liability company. It is ultimately owned through a succession of single member limited liability holding companies by Drumm Merger Co., which is a Delaware corporation with a principal place of business in California. Accordingly, it is a citizen of Delaware and California for purposes of diversity.

7. Silver Spring is a Delaware limited liability company. It is ultimately owned through a succession of single member limited liability holding companies by Drumm Merger Co.,

which is a Delaware corporation with a principal place of business in California. Accordingly, it is a citizen of Delaware and California for purposes of diversity.

8. Martin Chopp is an individual who is domiciled in Lakewood, New Jersey, and thus is a citizen of New Jersey for purposes of diversity.

9. Lynn Chopp is an individual who is domiciled in Lakewood, New Jersey, and thus is a citizen of New Jersey for purposes of diversity.

10. Solomon Chopp is an individual who is domiciled in Toms River, New Jersey, and thus is a citizen of New Jersey for purposes of diversity.

11. Rachel Chopp is an individual who is domiciled in Toms River, New Jersey, and thus is a citizen of New Jersey for purposes of diversity.

12. Sarah Chopp a/k/a Sara Rubin is an individual who is domiciled in Lakewood, New Jersey, and thus is a citizen of New Jersey for purposes of diversity.

13. Pnina Chopp is an individual who is domiciled in Lakewood, New Jersey, and thus is a citizen of New Jersey for purposes of diversity.

14. Avrohom Prager is an individual who is domiciled in Lakewood, New Jersey, and thus is a citizen of New Jersey for purposes of diversity.

15. Shulamit Prager is an individual who is domiciled in Lakewood, New Jersey, and thus is a citizen of New Jersey for purposes of diversity.

16. Bedrock HC WI LLC is a Wisconsin limited liability company with a principal place of business in Lakewood, New Jersey. Its members are Martin Chopp, Lynn Chopp, Solomon Chopp, Rachel Chopp, Sarah Chopp, Pnina Chopp, Avrohom Prager, and Shulamit Prager. Accordingly, for purposes of diversity, Bedrock HC WI LLC is a citizen of New Jersey.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship of the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18. This Court has personal jurisdiction over Individual Defendants because they reside in and are domiciled in New Jersey. This Court has personal jurisdiction over Bedrock HC WI LLC because its principal place of business is in New Jersey. Further, this Court has personal jurisdiction over Defendants because the claims set forth herein arise out of Defendants' contacts with New Jersey.

19. Venue is proper in this Court because Defendants reside in this judicial district, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and Defendants are subject to the Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

20. The GPH Entities and Tenants are parties to a Master Lease dated October 1, 2019 (as amended from time to time, the "Master Lease") pursuant to which the GPH Entities lease the Premises to Tenants for Tenants to operate the Facilities.

21. Bedrock HC WI LLC is the sole member of each of the Tenants and, upon information and belief, is merely a holding company for the membership interests of the Tenants with no separate business operations.

22. The Individual Defendants hold 100% of the membership interests of Bedrock HC WI LLC.

23. The Master Lease provided that the Premises were being leased to Tenants as "a single economic unit," with the lease of the Premises being a "single and inseparable transaction" and Tenants being jointly and severally liable for the obligations under the Master Lease.

24. Pursuant to the Master Lease, Tenants were obligated to pay rent to GPH Entities on a monthly basis, denoted as "Base Rent" in the Master Lease.

25. Tenants further were obligated by the Master Lease to pay all taxes relating to the Premises and the Facilities, including but not limited to property taxes for the Premises and nursing home assessments due to the Wisconsin Department of Health Services ("WI DHS") for the Facilities.

26. Tenants agreed in the Master Lease that they would be responsible for the payment of all other expenses relating to the Facilities, including, for instance, utilities, insurance, maintenance and repairs, and all other operating expenses.

27. The Master Lease also obligated Tenants to "keep and maintain the Premises in good appearance, repair and condition, and maintain proper housekeeping" and to "promptly make all repairs (interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen) necessary to keep the Premises in good and lawful order and condition and in compliance with all Legal Requirements, Insurance Requirements and Authorization and to maintain the Premises in a high quality operating and structural condition for use" as skilled nursing facilities.

28. Tenants also agreed that they would "continually use each Facility" as a skilled nursing facility "and shall operate each Facility in a manner consistent with a high quality healthcare facility."

29. It constituted an Event of Default under the Master Lease for Tenants to fail to pay any amount due thereunder within three days of the due date, with no right by Tenants to notice of, or an opportunity to cure, such failure to pay.

30. In the Master Lease, Tenants granted GPH Entities a security interest in, among other things, all of Tenants' "account, accounts receivable, payment intangibles, health-care-insurance receivables and any other right to the payment of money in whatever form," along with all proceeds of the same and deposit accounts in which the funds are deposited. GPH Entities perfected their security interest through filing UCC-1s.

31. The Master Lease further provided that "[a]fter the occurrence of an Event of Default and until such Event of Default is cured (as evidence in writing by Landlord)," then Tenants "shall not make any payments or distributions" to, among others, "any shareholder, member, partner or other equity interest holder of Tenant[s]" or any affiliate of Tenants.

32. Tenants defaulted under the Master Lease in a variety of manners, including but not limited to consistently failing to pay Base Rent to GPH Entities when due; failing to pay property taxes relating to the Premises when due; failing to pay nursing home assessments due to WI DHS; failing to maintain the Premises as required by the Master Lease; and failing to operate each of the Facilities in a manner consistent with a high quality healthcare facility.

33. Due to Tenants' breaches of the Master Lease, GPH Entities terminated the Master Lease effective as of December 23, 2024.

34. As a result of Tenants' breaches of the Master Lease, GPH Entities have been harmed significantly.

35. While GPH Entities held a security deposit under the Master Lease, even after application of the security deposit to outstanding Base Rent through December 2024 and a portion

of the outstanding property taxes, there remain property taxes due and owing for the Premises from tax year 2024, plus impound amounts due for property taxes for tax year 2025.

36. Additionally, to the knowledge of GPH Entities, Tenants have not repaired the deficient property conditions at the Premises arising from Tenants' failure to maintain the Premises as required by the Master Lease.

37. Further, Tenants continue to occupy the Premises and operate the Facilities due to their refusal to take necessary steps to cooperate in the transition of the Facilities to a new operator, but Tenants have failed and refused to pay Base Rent or tax impounds for any months in 2025 to date.

38. Tenants' failure to operate each of the Facilities in a manner consistent with a high quality healthcare facility has resulted in one of the Facilities – the Facility located in Ft. Atkinson, Wisconsin – being named a "Special Focus Facility" under the Centers for Medicare and Medicaid Services Special Focus Facility program. The Special Focus Facility program designates nursing facilities that have had a history of serious quality problems for increased visitations by state surveyors and more stringent enforcement actions for deficiencies identified by those state surveyors. In Wisconsin, only two of the approximately 330 nursing facilities in the state are designated as Special Focus Facilities.

39. Additionally, within the six months prior to the filing of this action, two other Facilities were on the list of Special Focus Facility candidates, and one of those Facilities currently remains on the list of Special Focus Facility candidates as of the filing of this action. Like Special Focus Facilities, the Special Focus Facility candidates are designated based on persistent records of poor care. Ten nursing facilities in Wisconsin at a time are designated Special Focus Facility candidates.

40. Thus, of the four Facilities leased by GPH Entities to Tenants, three of them have been a Special Focus Facility or candidate within the last six months. In other words, 75% of the Facilities GPH Entities leased to Tenants have been designated within the last six months as some of the worst performing 12 nursing facilities in the state.

41. The Special Focus Facility and candidate designations devalue GPH Entities' property – the Premises – and have made finding new operators/tenants for the Facilities far more difficult.

42. Upon information and belief, the various breaches of the Master Lease – from Tenants' failure to pay amounts owed to Tenants' failure to maintain the Premises to Tenants' failure to operate the Facilities in a manner consistent with high quality healthcare facilities – have been a result of Tenants' persistent insolvency.

43. In that regard, Tenants repeatedly have failed to pay their debts when due.

44. Specifically, beginning in or around 2022, Tenants failed to pay nursing home assessments due to WI DHS, which past due assessment amounts ballooned to millions of dollars between 2022 and 2024.

45. From at least the time that Tenants stopped paying nursing home assessments to WI DHS, there was a continuous Event of Default under the Master Lease.

46. Tenants also failed to pay property taxes for the Premises for tax year 2022 when such taxes were due to the taxing authorities. In fact, those 2022 taxes were not paid until 2024.

47. Due to Tenants' failure to pay property taxes for the Premises when due, GPH Entities elected under the Master Lease to have Tenants impound with GPH Entities on a monthly basis estimated property taxes for the Premises for 2023. However, Tenants failed to pay such

impound amounts when due under the Master Lease. Tenants also failed to pay such 2023 property taxes when due to the taxing authorities, instead only paying such amounts belatedly during 2024.

48. Throughout 2024, Tenants failed to pay property tax impounds to GPH Entities when due under the Master Lease and further failed to pay property taxes to the taxing authorities when due. Indeed, Tenants never paid the 2024 property taxes for the Facilities. As a result, GPH Entities have paid the 2024 property taxes for the Premises even though such property taxes were Tenants' obligations under the Master Lease. Tenants have failed to reimburse GPH Entities for such 2024 property tax payments.

49. Further, throughout the term of the Lease, Tenants often failed to pay Base Rent to GPH Entities when due.

50. Upon information and belief, from at least 2022 forward, Tenants also failed to pay other vendors and expenses of the Facilities on a timely basis.

51. Tenants consistently reported in financial information delivered to GPH Entities pursuant to the Master Lease that their cash position was negative, supporting the conclusion that Tenants were unable to pay debts when due.

52. Further, for multiple years, Tenants consistently have had current assets that are less than Tenants' current liabilities, and total assets that are less than their total liabilities.

53. On a consolidated basis, Tenants' Medicaid cost reports reflect that they had negative income of more than $3.6 million in 2023 and had negative equity as of December 31, 2023 of $1,205,282 (i.e. their total liabilities exceeded their total assets were exceeded by that amount).

54. Then, in 2024, Tenants' Medicaid cost reports reflect that on a consolidated basis they had negative income that year of more than $1.3 million, and had negative equity as of

December 31, 2024 of $548,025 (i.e. their total liabilities exceeded their total assets were exceeded by that amount).

55. Notwithstanding Tenants' negative equity, failure to pay debts as they came due, failure to generate positive income, and the ongoing and expanding Events of Default under the Master Lease, Tenants paid at least $860,217 in distributions between 2022 and 2024 according to Tenants' Medicaid cost reports.

56. In 2022, the same year Tenants stopped paying nursing home assessments to WI DHS, Tenants paid aggregate distributions, net of any reported capital contributions, totaling at least $550,845.00 according to their Medicaid cost reports (because the Greendale Facility's Medicaid cost report is not available publicly, this amount is exclusive of any distributions by the Greendale Facility Tenant to Defendants and the total distributions paid by Tenants to Defendants in 2022 may have been even higher than $550,845.00).

57. In 2023, as Tenants continued in default under the Master Lease and suffered continued losses, negative equity, and a failure to pay debts when due, they distributed another $113,732, net of any reported capital contributions, according to their Medicaid cost reports.

58. In 2024, with Master Lease defaults continuing and further losses, continued negative equity, and continued failure to pay debts when due, Tenants distributed another $195,640, net of any reported capital contributions, according to their Medicaid cost reports.

59. Upon information and belief, such distributions were paid to Bedrock HC WI LLC in the first instance, which in turn distributed such amounts to Individual Defendants, the ultimate owners of Tenants.

60. The distributions were transfers of funds from Tenants, which were insolvent at the time, to Defendants.

61. Defendants provided no reasonably equivalent value – or any value at all – to Tenants in exchange for the distributions from Tenants to Defendants.

62. Upon information and belief, Tenants made additional transfers of funds to Defendants and their affiliated parties, which transfers were not recorded as distributions on Tenants' books and records to hide the true amounts Tenants transferred to Defendants and their affiliates.

63. The remaining assets of Tenants after the transfers of funds to Defendants were unreasonably small in relation to their business of operating nursing homes.

64. Tenants knew, or should have known, that they would be unable to pay their debts as they came due after the transfers.

65. The transfers were done to hinder, delay, or defraud creditors of Tenants, to the benefit of Defendants. Among other factors demonstrating such intent are that Tenants were insolvent at the time of the transfers, Tenants were losing significant amounts of money on an annual basis, Tenants had significant debts and obligations owed to third-party creditors, the transfers were to insiders, and there was no consideration provided to Tenants for the transfers.

## COUNT I – VIOLATION OF N.J.S.A. 25:2-25

66. GPH Entities incorporate by reference the foregoing allegations as if set forth in full herein, except to the extent inconsistent herewith.

67. Pursuant to the New Jersey Uniform Voidable Transactions Act ("NJUVTA"), a transfer by a debtor is voidable as to a creditor, "whether the creditor's claim arose before or after the transfer was made" if the debtor made the transfer (1) "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor," or (2) "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation" and the debtor either "[w]as engaged or was about to

engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due."

68. At all times from 2022 to 2024, GPH Entities were creditors of Tenants.

69. The distributions by Tenants to Defendants were made with intent to hinder, delay, or defraud creditors of Tenants.

70. Tenants did not receive reasonably equivalent value for the distributions made to Defendants, and in fact received no consideration for such distributions.

71. Tenants (and Defendants) knew or should have known that Tenants' remaining assets would be unreasonably small to operate their business, namely operating the nursing homes.

72. Tenants (and Defendants) knew or reasonably should have known that Tenants had incurred and would incur debts beyond Tenants' ability to pay them as they came due.

73. The distributions to Defendants were in violation of the NJUVTA and are voidable.

74. The distributions to Defendants were willfull, knowing, and done in order to evade creditors. Such distributions were outrageous and without justification, such as to warrant imposition of punitive damages on Defendants for orchestrating such distributions.

### COUNT II – CONVERSION

75. GPH Entities incorporate by reference the foregoing allegations as if set forth in full herein, except to the extent inconsistent herewith.

76. GPH Entities had a property right, pursuant to the security interest granted to them by Tenants, in the funds paid as distributions to Defendants.

77. Defendants wrongfully interfered with GPH Entities' property and rights relating to the funds paid as distributions to Defendants by causing and accepting payment of such funds notwithstanding GPH Entities' rights.

78. As such, Defendants have converted GPH Entities' property.

79. Such conversion of GPH Entities' property was done knowingly and willfully. The conversion was outrageous and without justification and thus warrants the imposition of punitive damages.

**COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT**

80. GPH Entities incorporate by reference the foregoing allegations as if set forth in full herein, except to the extent inconsistent herewith.

81. GPH Entities were parties to the Master Lease with Tenants, which was a valid and enforceable existing contract.

82. Defendants intentionally and maliciously interfered with the contractual relationship between GPH Entities and Tenants, including by causing Tenants to distribute to Defendants funds in violation of the express terms of the Master Lease.

83. Such interference was unjustified and was not for any proper business purpose, in that it deprived Tenants of funds solely for the purpose of payments to equity holders in advance of creditors.

84. Indeed, the distributions to Defendants and orchestrated by them, as set forth above, are violative of the NJUVTA and further converted property belonging to GPH Entities pursuant to GPH Entities' security interest.

85. As a result of Defendants' tortious interference with contract, GPH Entities have been damaged, including by not being paid amounts due, by having Premises that have not been

maintained and repaired as required by the Master Lease, and by having the value of the Premises decreased due to Special Focus Facility and candidate designations.

86. Defendants' tortious interference with contract was willful and knowing. It was outrageous and without justification and thus warrants the imposition of punitive damages.

## COUNT IV – CIVIL CONSPIRACY

87. GPH Entities incorporate by reference the foregoing allegations as if set forth in full herein, except to the extent inconsistent herewith.

88. Defendants entered into a conspiracy to cause Tenants to distribute funds to them and to avoid payment obligations to creditors, including GPH Entities, in violation of New Jersey law, GPH Entities' security interest, and the terms of the Master Lease.

89. Defendants acted on their conspiracy by causing Tenants to make such distributions notwithstanding New Jersey law, GPH Entities' security interest, and the terms of the Master Lease.

90. These unlawful actions have caused GPH Entities to suffer damages because Defendants have siphoned assets that belonged to GPH Entities and that otherwise would be available to meet Tenants' obligations to GPH Entities.

## PRAYER FOR RELIEF

WHEREFORE, GPH Entities respectfully request that this Court enter judgment in their favor against Defendants as follows:

(a) Order the distributions and payments by Tenants to Defendants to be set aside and annulled;

(b) Award GPH Entities compensatory damages in an amount to be determined at trial;

(c) Award GPH Entities punitive damages in an amount to be determined at trial;

(d) Award GPH Entities prejudgment and post-judgment interest.

(e) Award GPH Entities their attorneys' fees and costs associated with bringing and litigating this action; and

(f) Grant any and all further relief that the Court shall deem appropriate.

Dated: May 29, 2025

Respectfully submitted,

/s/ Daniel C. Fleming
Daniel C. Fleming, Esq.
WONG FLEMING P.C.
821 Alexander Road, Suite 200
Princeton, New Jersey 08540
Phone: (609) 951-9520
Fax: (609) 951-0270
Email: dfleming@wongfleming.com